# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| **MARY STEWART, as next of kin** | ) | |
| **and Administrator Ad Litem of** | ) | |
| **DARRIUS STEWART, Deceased, and** | ) | |
| **HENRY WILLIAMS as next of kin** | ) | |
| **and Father of DARRIUS STEWART,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **No. 2:16-cv-02574-SHM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF MEMPHIS, and OFFICER** | ) | |
| **CONNOR SCHILLING, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

Former Memphis police officer Connor Schilling fatally shot Darrius Stewart ("Stewart") during an arrest. Stewart's parents Mary Stewart and Henry Williams bring this action against Defendants Schilling and the City of Memphis (the "City") under 42 U.S.C. § 1983. They allege that Schilling used excessive force[1] in violation of Stewart's Fourth Amendment rights and that the City's policies and customs caused that violation.[2]

---

[1] Plaintiffs also make passing reference to Schilling's "unlawful seizure" of Stewart. (ECF No. 166-17 at 2407.) Plaintiffs do not treat that "seizure" as a separate constitutional violation. They argue only excessive force. There is no dispute that Schilling had probable cause to arrest Stewart. The Court will address only the issue of excessive force.

[2] The Court has dismissed Plaintiffs' official capacity claims against Schilling and former Memphis Police Department Director Toney Armstrong. (ECF No. 37 at 297-98.) The Court has also dismissed Plaintiffs' state law

Before the Court are three motions. The first is Schilling's Motion for Summary Judgment, filed on May 30, 2018. (ECF No. 152.) Plaintiffs responded on June 27, 2018. (ECF No. 165.) Schilling replied on July 11, 2018. (ECF No. 172.)

The second is the City's Motion for Summary Judgment, filed on May 30, 2018. (ECF No. 155.) Plaintiffs responded on June 27, 2018. (ECF No. 166.) The City replied on July 11, 2018. (ECF No. 173.)

The third is Schilling's Motion to Exclude Testimony of Jeffrey J. Noble, filed on May 30, 2018. (ECF No. 153.) Plaintiffs responded on June 19, 2018. (ECF No. 162.) Schilling replied on July 2, 2018. (ECF No. 169.)

For the following reasons, Schilling's Motion for Summary Judgment is DENIED, the City's Motion for Summary Judgment is GRANTED, and Schilling's Motion to Exclude Testimony of Jeffrey J. Noble is GRANTED.

## I. Background

Around 11:00 p.m. on July 17, 2015, Schilling pulled a car over because it had a broken headlight. (ECF No. 165-1 at 2165.)[3] Stewart, one of three occupants, was in the backseat. (Id. at 2166; ECF No. 149 at 851-52.) Schilling approached the

---

claims and their claim under 42 U.S.C. § 1983 for violation of Stewart's Fourteenth Amendment rights. (Id. at 298-307.)

[3] Unless otherwise noted, all pin cites for record citations are to the "PageID" page number.

car and asked the occupants for identification. (ECF No. 165-1 at 2165.) After getting their identification, Schilling returned to his patrol car and ran the identification through the National Crime Information Center System. (ECF No. 166-1 at 2292.) The system showed that Stewart had out-of-state arrest warrants. (Id.)

Schilling approached the car again and asked Stewart to step outside. (Id. at 2292-93.) Stewart complied. (Id. at 2293.) Schilling patted Stewart down for weapons, found none, and placed Stewart in the back of the patrol car without handcuffing him. (Id.; ECF No. 149 at 865.) Schilling gave the driver of the car a ticket and allowed him to leave. (ECF. No. 166-1 at 2293.) Schilling then contacted Memphis police dispatch to verify Stewart's warrants. (Id.) Dispatch confirmed the warrants, informed Schilling that Stewart would be extradited, and directed Schilling to take Stewart to jail. (Id.) Schilling, intending to handcuff Stewart, opened the rear patrol car door on the side where Stewart sat. (Id.)

The parties agree on some aspects of what happened next. They agree that there was a physical struggle that lasted for a few minutes. (ECF No. 165-1 at 2169.) They agree that Schilling shot Stewart twice and that Schilling and Stewart were never more than two feet apart when Schilling fired. (ECF No.

3

165-1 at 2172; 166-1 at 2296.) They agree that one bullet struck Stewart in his upper right chest. (ECF No. 165-1 at 2172.) They agree that the other bullet traveled through Stewart's left arm and struck him in the left side of his torso. (Id.) They agree that, after he was shot, Stewart ran for several yards, collapsed, and later died of his injuries. (ECF No. 166-1 at 2297.) The parties disagree on three principal points: (1) whether Stewart was violent and aggressive during the struggle; (2) the timing and order of Schilling's two shots; and (3) Stewart's body position when Schilling shot him.

Defendants contend that Stewart charged Schilling and wrestled with him on the ground. (ECF No. 149 at 877.) Stewart bit Schilling and twisted his genitals. (Id. at 885, 949.) Stewart eventually got on top of Schilling. (Id. at 949.) Stewart punched Schilling. (Id. at 882.) Stewart got Schilling's handcuffs and used them to strike Schilling on the top of his head and across his nose. (Id. at 883-84.) Stewart tried to gain control of Schilling's gun. (Id. at 892.) Schilling attempted to call for backup but received no response because his radio had been knocked to an unmonitored frequency. (Id. at 915.) Exhausted, afraid he might lose consciousness from blows to the head, and in fear for his life, Schilling shot Stewart twice. (Id. at 894.) The first shot hit Stewart's left

arm and travelled into the left side of his torso. (ECF No. 151-3 at 1164.) The second hit Stewart in the upper right chest. (Id.) Stewart was moving toward Schilling when Schilling fired the first shot and Stewart was still coming toward Schilling when Schilling fired the second. (ECF No. 149-3 at 1025-26.) Schilling fired the shots approximately two seconds apart. (Id. at 1025.)

Plaintiffs contend that Stewart was nonviolently trying to escape. (ECF No. 165-19 at 2265.) Stewart did not punch or bite Schilling, strike Schilling with his handcuffs, or grab Schilling's genitals. (ECF No. 165-1 at 2169-70.) Stewart did not try to gain control of Schilling's gun. (Id. at 2171.) Because Schilling was larger and stronger than Stewart and, unlike Stewart, trained in hand-to-hand combat, Schilling could not have reasonably feared for his life during the struggle. (ECF No. 165-19 at 2265; ECF No. 166-17 at 2409.) Schilling shot Stewart first in the upper right chest while Stewart was on the ground. (ECF No. 165-19 at 2265.) As Stewart stood up and began turning away to flee, Schilling shot Stewart through his left arm and into the left side of his torso, "technically in his back." (Id. at 2266, 2272.)

Plaintiffs filed their Amended Complaint on July 13, 2016. (ECF No. 4.) Defendants filed their motions for summary

judgment on May 30, 2018.  (ECF No. 152; ECF No. 155.)  Both Defendants contend that Schilling did not violate Stewart's Fourth Amendment rights.  (ECF No. 152-2 at 1303; ECF No. 155-1 at 1674.)  Schilling also contends that he is entitled to summary judgment on the ground of qualified immunity.  (ECF No. 152-2 at 1300-01).  The City contends that, even if Schilling violated Stewart's Fourth Amendment rights, no City policy or custom caused that violation.  (ECF No. 155-1 at 1679).

## II.  Jurisdiction

The Court has federal-question jurisdiction.  Under 28 U.S.C. § 1331, district courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States."  Plaintiffs' remaining claims assert a right to relief against Defendants under 42 U.S.C. § 1983.  (ECF No. 4 at 32.)  Those claims arise under the laws of the United States.

## III. Motions for Summary Judgment

### A.  Standard of Review

Under Federal Rule of Civil Procedure 56, a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must show that the nonmoving

party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of its case. <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Peeples v. City of Detroit</u>, 891 F.3d 622, 630 (6th Cir. 2018).

When confronted with a properly-supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial. <u>See</u> Fed. R. Civ. P. 56(c). "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'" <u>EEOC v. Ford Motor Co.</u>, 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting <u>Chappell v. City of Cleveland</u>, 585 F.3d 901, 913 (6th Cir. 2009)). The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." <u>Lossia v. Flagstar Bancorp, Inc.</u>, 895 F.3d 423, 428 (6th Cir. 2018) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." <u>FDIC v. Jeff Miller Stables</u>, 573 F.3d

289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

## B. Plaintiffs' Claim Against Schilling

Under 42 U.S.C. § 1983, state officials are liable for damages if they deprive anyone of his constitutional or statutory rights. See Kaminski v. Coulter, 865 F.3d 339, 345 (6th Cir. 2017). State officials can assert a defense of qualified immunity. That doctrine protects them from civil liability unless the statutory or constitutional rights were clearly established when the violation occurred. See Messerschmidt v. Millender, 565 U.S. 535, 546 (2012).

Schilling asserts that he is entitled to qualified immunity. Plaintiffs argue that the doctrine does not protect Schilling because he violated Stewart's clearly established Fourth Amendment right to be free from excessive force.

Excessive force claims are analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. 386, 395 (1989). "[W]hether the force used to effect a particular seizure is reasonable . . . requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal

8

quotation marks omitted).  Although reasonableness is ultimately based on the totality of the circumstances, three factors guide the analysis: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  Id.

Whether an officer is entitled to qualified immunity is a question of law.  See Dickerson v. McClellan, 101 F.3d 1151, 1157 (6th Cir. 1996).  When "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."  Sova v. City of Mt. Pleasant, 142 F.3d 898, 903 (6th Cir. 1998).  The first task is to determine the extent to which the record supports a plaintiff's version of events.  Chappell, 585 F.3d at 909.  If plaintiff offers evidence sufficient to create a genuine dispute of material fact, the Court must decide whether, viewing those disputed facts in the light most favorable to plaintiff, the officer is nevertheless entitled to qualified immunity.  Id. at 907 (noting that qualified immunity is not appropriate if "viewing the evidence in the light most favorable to [plaintiff], a constitutional right was violated and that . . . right was clearly established at the time of the violation").

### 1. Genuine Disputes of Material Fact

There are important differences between Schilling's and Plaintiffs' accounts of what happened on the night of July 17, 2015. The parties disagree about: (1) whether Stewart was violent and aggressive; (2) the timing and order of the shots; and (3) Stewart's body position when Schilling shot him. Schilling argues that Plaintiffs have not offered sufficient evidence to dispute his version of events. Plaintiffs disagree.

Where the person shot dead is unable to testify, the Court "may not simply accept what may be a self-serving account of the police officer." Jefferson v. Lewis, 594 F.3d 454, 462 (6th Cir. 2010) (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)). It must "look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story." Id. The first question here is whether the Court can consider two witness statements on which Plaintiffs rely.

### a. Consideration of Danyale Franklin's Statements

Plaintiffs rely in part on two witness statements made by Danyale Franklin to demonstrate that there are disputes of material fact. Franklin gave her first statement to the Memphis Police Department on the night of the shooting. (ECF No. 165-7 at 2212.) She gave her second statement to the Tennessee Bureau

10

of Investigation about a week later. (Id. at 2220.) Schilling argues that the Court should not consider those statements. (ECF No. 172 at 2454.) He asserts that Plaintiffs' reliance on them violates Federal Rule of Civil Procedure 56(c) because they are "not in the record before the Court, Plaintiffs have provided no sworn testimony to authenticate or identify [the] statement[s], and the statement[s] [are] not [] exhibit[s] to any of the depositions." Id. Schilling's argument is not well-taken.

First, the statements are in the record. That Plaintiffs did not include them as deposition exhibits is not material. Plaintiffs attached them as exhibits to their responsive brief. See (ECF No. 165-7.) There is no requirement that materials relied on at summary judgment predate a party's motion. See Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment (stating that materials not already in the record may be referenced if they are "placed in the record"); Swank v. Hale, No. 2:12-cv-1031, 2016 WL 1156517, at *3 (S.D. Ohio Mar. 24, 2016) ("[A party] may place such materials into the record by attaching them to the summary judgment motion.").

Second, materials used at summary judgment to demonstrate a genuine dispute of material fact need not be authenticated. The 2010 amendments to Rule 56 removed that requirement. A party

11

may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2); see also Magnum v. Repp, 674 F. App'x 531, 536-37 (6th Cir. 2017); Mauer v. Indep. Town, 870 F.3d 380, 384 (5th Cir. 2017) ("At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form. . . . [M]aterials cited to support or dispute a fact need only be capable of being presented in a form that would be admissible in evidence.") (citations and internal quotation marks omitted).

Schilling does not argue that Franklin's statements cannot be presented in an admissible form.  He represents that he has been unable to locate Franklin for a deposition.  (ECF No. 172 at 2454.)  That representation is not an argument against eventual admissibility.  Because Schilling has not objected to admissibility, the Court will consider the statements.

### b.  Disputes of Material Fact

### i.  Whether Stewart Was Violent and Aggressive

Schilling offers evidence that Stewart, after running out of the patrol car, bit Schilling, twisted his genitals, got on top of him, punched him, struck him with his own handcuffs, and tried to grab his gun.  Schilling argues that Plaintiffs have

not cited sufficient evidence to dispute these facts. (ECF No. 172 at 2448.)[4]

First, Schilling testified that, while he was on top of Stewart, Stewart bit him on his right bicep and twisted his genitals. (ECF No. 149 at 885, 949.) A photograph taken the night of the shooting shows what appears to be a bite mark on Schilling's arm. (ECF No. 152-19 at 1565.) No witness says that Stewart did not bite Schilling or twist his genitals. Plaintiffs cite nothing else. It is undisputed that, at some point during the struggle, while Schilling was on top of Stewart, Stewart bit Schilling on his right bicep and twisted his genitals.

Second, Schilling testified that Stewart got on top of him. (ECF No. 149 at 893.) Ernestine Parrot testified that she saw the struggle and that Stewart was never on top of Schilling. (ECF No. 165-10 at 2239.) Although Parrot did not see the entire struggle, she did see the relevant portion: the few minutes leading up to the first shot. (Id. at 2230, 2235, 2239.) Schilling testified that Stewart was on top of him towards the end of the fight, just before Schilling shot Stewart. (ECF No. 149 at 893.) Because Parrot testified that Stewart was not on

---

[4] Both parties reference a video that they argue supports their version of events. The Court has reviewed the video and finds it largely unhelpful. It shows about twenty seconds of Schilling and Stewart struggling physically. At no point does Stewart appear to be on top of Schilling. The video is short and of low quality. It does not resolve any factual dispute.

13

top of Schilling then, whether Stewart was on top of Schilling is sufficiently disputed.

Third, Schilling testified that Stewart punched him. (ECF No. 149-882.) Two witnesses dispute that. Parrot testified that she "didn't see Stewart, you know, fighting [Schilling] or hitting him or nothing like that." (ECF No. 165-10 at 2238.) William Rogers testified that he "didn't see any punches" from Stewart. (ECF No. 165-12 at 2245.) Although neither saw the entire struggle, (ECF No. 165-10 at 2235; ECF No. 165-12 at 2243), both saw the few minutes leading up to the first gunshot, (ECF No. 165-10 at 2230, 2239; ECF No. 165-12 at 2244). Schilling testified that Stewart was striking him towards the end of the fight, just before he shot Stewart. (ECF No. 149 at 893.) Whether Stewart punched Schilling is sufficiently disputed.

Fourth, Schilling testified that Stewart hit Schilling on top of his head and across his nose with his handcuffs. (ECF No. 149 at 882-84.) Parrot and Rogers testified that they never saw Stewart strike Schilling. (ECF No. 165-10 at 2238; ECF No. 165-12 at 2245.) Schilling testified that Stewart struck him with handcuffs towards the end of the fight, just before Schilling shot Stewart, which puts Schilling's testimony in conflict with Parrot's and Rogers'. (ECF No. 149 at 893.)

Parrot also testified that she did not see anything in Stewart's hands. (ECF No. 165-10 at 2239.) Schilling's argument that, based on photographic evidence, it is indisputable that Stewart hit him with handcuffs is not persuasive. Photographs taken the night of the shooting show little or no damage to Schilling's head and face. (ECF No. 152-19 at 1557-63.) They do not "blatantly contradict[]" Parrot's and Rogers' testimony. Scott v. Harris, 550 U.S. 372, 380 (2007); accord Bazan ex rel. Bazan v. Hidalgo Cty., 246 F.3d 481, 493 (5th Cir. 2001) (noting that the lack of head wounds and blood on a flashlight contradicted officer's testimony that suspect hit officer on the head with his flashlight). The presence of Stewart's DNA on Schilling's handcuffs is not dispositive. (ECF No. 152-23 at 1638.) A reasonable jury could conclude that the DNA was the incidental result of their minutes-long physical struggle. There is no incontrovertible proof that Stewart used the handcuffs as weapons to attack Schilling. Whether Stewart struck Schilling with his handcuffs is sufficiently disputed.

Fifth, Schilling testified that Stewart tried to gain control of Schilling's gun. (ECF No. 149 at 893.) Schilling's testimony was specific. When asked exactly how and when Stewart went for Schilling's gun, Schilling testified that it happened at the end of the fight, just before the first shot. (Id. at

15

892-93.) Stewart was on top of Schilling, using Stewart's right hand to strike with the handcuffs while using his left hand to reach for the gun. (Id.) Parrot testified that Stewart was not on top of Schilling during the minutes leading up to the first shot. (ECF No. 165-10 at 2239.) Parrot and Rogers testified that Stewart was not striking Schilling during that time. (Id. at 2238; ECF No. 165-12 at 2245.) Because Schilling's claim that Stewart reached for Schilling's gun is directly connected to two disputed facts, Parrot's and Rogers's testimony is "circumstantial evidence that, if believed, would tend to discredit" Schilling's account. Jefferson, 594 F.3d at 462. Their testimony is sufficient to support an inference that Stewart did not reach for Schilling's gun.

### ii. The Timing and Order of the Shots

The parties disagree about the timing and order of the shots. Schilling testified that he fired the shots no more than two seconds apart. (ECF No. 149-3 at 1017.) Witness testimony suggests it was longer than that. Rogers testified that the shots were fired between fifteen and twenty seconds apart. (ECF No. 165-12 at 2246.) Parrot, who says she was standing near Stewart and Schilling as they struggled, testified that, after the first gunshot, she "ran to [her] car, jumped in [her] car, took off down the street and made a right turn . . . and [then]

16

heard another shot." (ECF No. 165-10 at 2239.) That would take longer than two seconds. The timing of the shots is sufficiently disputed.

Schilling provides some evidence that the first shot was the one that entered Stewart's left arm and the side of his torso, and that the second shot was the one that struck Stewart in his upper right chest. Schilling told the Memphis Police Inspectional Services Bureau that he aimed the first shot towards the "left side of [Stewart's] chest." (ECF No. 149-3 at 1017.) Jonathyn Priest's report states that "the best explanation for shot order given the available evidence and information in the provided materials is consistent with Officer Schilling's statement of the left occurring first . . . and right chest . . . occurring second." (ECF No. 151-5 at 1256.) Plaintiffs argue that this issue is disputed because their expert Roger Mitchell testified that "the second gunshot wound is on the back side of the left arm." (ECF No. 165-18 at 2261.) Their argument is not well-taken. A questioning attorney, not Mitchell, used the term "second gunshot." (Id.) The record shows that Mitchell was not opining on the shot order. He referred to gunshot wound number two from the medical examiner's report. (ECF No. 165-18 at 2259-60.) The examiner labeled the gunshot into the left arm as gunshot number two, but stated that

17

the numbering was "not intended to indicate the order in which [the wounds] may have been sustained." (ECF No. 132-1 at 610.)

Other evidence disputes Schilling's account. The parties agree that Stewart and Schilling were farther apart when Stewart was shot in the left arm than when he was shot in the upper right chest. (ECF 165-1 at 2174.) Danyale Franklin and William Rogers stated that Stewart was farther away from Schilling at the time of the second shot than he was at the first. (ECF No. 165-7 at 2214; ECF No. 165-12 at 2246.) A jury could reasonably infer that the first shot was the one that struck Stewart in his chest and the second shot was the one that went through his left arm and into his torso. The order of shots is sufficiently disputed.

### iii. Stewart's Body Position When Schilling Shot Him

The parties offer conflicting accounts of Stewart's body position when Schilling shot him. In an interview with the Memphis Police Inspectional Services Bureau, Schilling said Stewart was coming towards him when Schilling fired both shots. (ECF No. 149-3 at 1025-26.) Parrot testified that Stewart was on the ground when Schilling first shot him. (ECF No. 165-10 at 2230.) Franklin said she heard the first shot and then "saw [Schilling] begin to stand up and [Stewart] struggl[e] to get up." (ECF No. 165-7 at 2213.) Franklin and Rogers said that,

18

after the first shot, Stewart stood up, turned to flee, took at least a step, and was shot again. (Id. at 2213-14; ECF No. 167-1 at 2424.) Stewart's body position at the time of the shots is disputed.

### c. Facts for Qualified Immunity Analysis

Taking the facts in the light most favorable to Plaintiffs, the following is what happened after Stewart fled from Schilling's patrol car: Schilling took hold of Stewart and held him down. The two of them wrestled for several minutes. Stewart tried to get away and Schilling tried to subdue him. While under Schilling, Stewart bit Schilling on his right bicep and twisted his genitals. They separated. Then, at very close range, Schilling shot Stewart in the upper right chest while Stewart lay on the ground. Stewart stood up, turned to flee, and moved no more than two feet before Schilling shot him again, roughly twenty seconds after the first shot.

Given this set of facts, the Court must decide whether Schilling is entitled to qualified immunity. For the following reasons, he is not.

### 2. Qualified Immunity

Qualified immunity will shield Schilling from civil liability unless: (1) he violated one of Stewart's constitutional rights; and (2) that right was clearly

established at the time.[5]   Plaintiffs contend that Schilling
violated Stewart's clearly established Fourth Amendment right to
be free from excessive force.

### a.   Constitutional Right

Police officers have the right to use some degree of force
when carrying out an arrest.   See Graham, 490 U.S. at 396.   How
much force is too much depends on the circumstances.   Id.   A use
of force violates the Fourth Amendment's guarantee against
unreasonable seizures if it was not "objectively reasonable" in
light of the events confronting the officer.   Id.   at 397.
Whether force was objectively reasonable depends on all of the
facts.   Three are afforded particular weight: (1) the severity
of the crime; (2) whether the suspect was actively resisting
arrest or attempting to evade arrest by flight; and (3) whether
the suspect posed an immediate threat to the safety of the
officer or others.   Id. at 396 (the "Graham factors").   The
reasonableness of the force must be judged from the perspective

---

[5] The Sixth Circuit has at times applied a third step to the qualified
immunity analysis: "whether the plaintiff has offered sufficient evidence to
indicate that what the official did was objectively unreasonable in light of
the clearly established constitutional rights."   See Sample v. Bailey, 409
F.3d 689, 696 (6th Cir. 2005) (quoting Feathers v. Aey, 319 F.3d 843, 848
(6th Cir. 2003)).   Recent precedent makes clear that "the test for qualified
immunity has only two prongs."   Brown v. Lewis, 779 F.3d 401, 417 (6th Cir.
2015).   In Fourth Amendment cases like this one, reasonableness does factor
into the first step of the qualified immunity inquiry.   Id.   "But there is no
additional, separate hurdle of reasonableness for [Plaintiffs] to overcome."
Id.

of a reasonable officer on the scene, not "with the 20/20 vision of hindsight." Id.

Two uses of force are at issue in this case: the first and second gunshots. When an officer uses force multiple times, the Sixth Circuit has found it appropriate to divide the incident into segments and to analyze each use of force on its own terms. See Harris v. City of Circleville, 583 F.3d 356, 365 (6th Cir. 2009). The officer's decisions leading up to the use of force are not material. See Livermore ex rel. Rohm v. Lubelan, 476 F.3d 397, 406 (6th Cir. 2007). Schilling's failure to handcuff Stewart or call for backup has no bearing on whether his use of force was reasonable. The focus is on the "'split-second judgments' made immediately before [Schilling] used allegedly excessive force." Id. at 407 (quoting Dickerson, 101 F.3d at 1162). Because the only difference between the two gunshots is Stewart's body position when Schilling shot him, much of the analysis overlaps.

### i.    The First Gunshot

Analyzing the first shot, the first Graham factor favors Plaintiffs. When an officer uses force during an attempt to arrest a suspect because of outstanding warrants, it is appropriate to consider both the severity of the crimes underlying the warrants and the severity of any crimes committed

during the attempted arrest. See Coitrone v. Murray, No. 1-13-CV-00132, 2015 WL 2384298, at *4 (E.D. Ky. May 19, 2015). The parties have not specified the crimes for which Stewart's arrest warrants were issued.[6] Schilling testified that he "didn't really take [the warrants] too serious" because his patrol car's computer system "told [him] a juvenile delinquency warrant or something like that." (ECF No. 149 at 865-66.) What matters under the first Graham factor is how the crimes underlying the warrants would have informed an "objective assessment of the danger a suspect poses at that moment." Bouggess v. Mattingly, 482 F.3d 886, 889 (6th Cir. 2007). An ambiguous description of juvenile delinquency would not suggest to a reasonable officer that Stewart posed an immediate threat of serious harm. The same is true of the crime Stewart committed after Schilling tried to subdue him: resisting arrest. Although Jackson v. Wilkins described resisting arrest as a "serious crime", the officers in that case used non-deadly force. 517 F. App'x 311, 316 (6th Cir. 2013). Stewart's resistance may have been

---

[6] Plaintiffs describe the crimes as felonies and "juvenile delinquency misdemeanors." (ECF No. 166-7 at 2404, 2409.) The City represents that it is undisputed that Stewart was "set to be extradited on an out-of-state felony warrant." (ECF No. 173 at 2513.) Neither memorandum of undisputed facts states that the warrants were for felonies. Neither memorandum represents what the crimes were. A Memphis Police Inspectional Services Bureau report states that, "[t]he crimes in this investigation are two counts of Sexual Abuse, 2nd Degree (Iowa) and Juvenile Absconding while on Probation (Illinois)." (ECF No. 166-8 at 2348.) Because Schilling does not contend that these crimes are undisputed facts, the Court will not treat them as undisputed.

sufficiently serious to warrant non-deadly force, but it would not have supported an "objective assessment" that deadly force was justified.  Bouggess, 482 F.3d at 889.

The second Graham factor has a mixed effect.  Stewart was resisting arrest and trying to escape.  This factor carries greater weight, however, when an officer employs non-deadly force.  When a suspect resists arrest and tries to flee, certain uses of force are reasonable that would not be if the suspect were compliant.  See, e.g., Rudlaff v. Gillispie, 791 F.3d 638, 642 (6th Cir. 2015) (taser); Landis v. Baker, 297 F. App'x 453, 461 (6th Cir. 2008) (baton strikes); Champion v. Outlook Nashville, Inc., 380 F.3d 893, 901 (6th Cir. 2004) (pepper spray).  Resisting arrest and trying to escape, without more, do not make deadly force reasonable.  See Garner, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.").

The third Graham factor favors Plaintiffs.  Viewing the facts in the light most favorable to them, Stewart physically struggled with Schilling but did not use a weapon; there was a brief lapse in the grappling; Stewart and Schilling separated; and Schilling shot Stewart while Stewart lay on the ground.  Stewart was unarmed.  He never reached for Schilling's gun.  On these facts, Stewart did not pose an immediate threat of serious

harm to Schilling. "It cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of <u>serious</u> physical harm to the officer or to others." <u>Bouggess</u>, 482 F.3d at 890 (emphasis in original).

<u>Bouggess</u>'s admonition is equally applicable here, although there is a nonmaterial distinction. Stewart and Schilling were very close to each other when Schilling fired. In <u>Bouggess</u>, the suspect, after physically struggling with the officer, had run ten feet before he was shot in the back. <u>Id.</u> at 889. The fear of a potential attack at close range is not enough. The relevant question is whether Stewart posed a serious threat of harm to Schilling. Although Stewart would have posed a lesser threat had he been ten feet away when Schilling shot him, Stewart -- unarmed and recumbent -- was not a threat that justified deadly force. <u>See id.</u> at 891-92; <u>Howser v. Anderson</u>, 150 F. App'x 533, 538 (6th Cir. 2005) ("[I]f Defendant intentionally shot a struggling suspect whose hands were visible throughout the relevant portions of the struggle and who was only attempting to get up or turn over, such a use of deadly

force would be excessive and would violate the decedent's Fourth Amendment rights.").

The struggle preceding the first shot, including the bite and genital twisting, does not compel a different conclusion. This was not a situation where a grave danger quickly dissipated. See Untalan v. City of Lorain, 430 F.3d 312, 315 (6th Cir. 2005) ("Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight facts show that the persons threatened could have escaped unharmed."). Schilling was not in serious danger in the first place. The bite and genital twisting did not put Schilling's life in peril or place him at risk of great bodily injury. They were not a "serious" danger. Bouggess, 482 F.3d at 892. Shooting Stewart in response to them was not reasonable. See id. at 891-92; Kirby v. Duva, 530 F.3d 475, 481-82 (6th Cir. 2008) (denying qualified immunity to officer where, under plaintiff's facts, "no one was ever in danger").

Two cases the City cites to support the reasonableness of Schilling's conduct are inapposite. In both the court held that the officers' use of deadly force was reasonable. Viewing the facts in the light most favorable to Plaintiffs, both are distinguishable. In Pollard v. City of Columbus, officers shot a suspect, believed to be armed, who led them on a high-speed

chase, crashed, reached out the window, clasped his hands as if to shoot, and pointed towards them. 780 F.3d 395, 400, 403 (6th Cir. 2015). A reasonable officer could believe that the Pollard suspect was about to kill them or their fellow officers. No reasonable officer could believe the same about Stewart. In Mendez v. Poitevent, an officer, after physically struggling with a suspect, shot the suspect immediately after having been concussed by a strike to the temple. 823 F.3d 326, 332 (5th Cir. 2016). "In that moment, it was reasonable for [the officer] -- concussed, disoriented, weakened, suffering a partial loss of vision, and fearing that he might lose consciousness in the presence of a violent suspected felon -- to believe that [the suspect] might . . . seriously injure or kill him." Id. The same might be true for Schilling under his version of events. It is not true under the facts taken in the light most favorable to Plaintiffs. Under those facts, Schilling was never in a comparably precarious position: Stewart never concussed Schilling or injured him in a similarly debilitating way. Neither of the cited cases supports the argument that Schilling acted reasonably when he shot Stewart.

The ultimate issue in deadly force cases is "whether [the officer] had an objectively reasonable belief that [the suspect] posed an imminent threat of serious physical harm to him or

others." <u>Bouggess</u>, 482 F.3d at 890. Viewing the facts in the light most favorable to Plaintiffs, an officer in Schilling's position would not have had a reasonable belief that Stewart posed such a threat. Schilling's first shot violated Stewart's Fourth Amendment right to be free from excessive force.

### ii.   The Second Gunshot

The second gunshot -- fired, as the Court must assume, when Stewart was two feet away and turning to flee -- was more unreasonable than the first. The first and second <u>Graham</u> factors apply as they did before. The third again favors Plaintiffs. Taking the facts in the light most favorable to them, about twenty seconds had passed between the first and second shots. Unarmed and turning to flee, Stewart was not a danger to anyone. The prospect that Stewart might turn to attack is not enough. Stewart had shown no such tendency. Schilling's second shot violated Stewart's Fourth Amendment right to be free from excessive force. <u>See</u> <u>Garner</u>, 471 U.S. at 11; <u>Bouggess</u>, 482 F.3d at 890-91; <u>Carden v. City of Knoxville</u>, 699 F. App'x 495, 498-99 (6th Cir. 2017).

### b.   Clearly Established

Both shots violated Stewart's Fourth Amendment right to be free from excessive force. The second issue is whether that right was clearly established on July 17, 2015. The Court must

27

first address a preliminary issue: the burden a plaintiff must meet to show that a constitutional right was clearly established.

### i.  Plaintiffs' Burden

Schilling cites Sixth Circuit precedent that, once qualified immunity has been raised as a defense, Plaintiffs have the burden of showing that Schilling is not entitled to it. (ECF No. 152-2 at 1300 (quoting Armstrong v. City of Melvindale, 432 F.3d 695, 699 (6th Cir. 2006)).)  Schilling argues that Plaintiffs have not met their burden.  He contends that Plaintiffs have not cited any case that shows Stewart's constitutional right was clearly established.[7]

The Court has a duty to conduct its own review of relevant precedent to determine whether an asserted right was clearly established.  See Elder v. Holloway, 510 U.S. 510, 516 (1994); DiLuzio v. Village of Yorkville, 796 F.3d 604, 608 (6th Cir. 2015).  Arrington-Bey v. City of Bedford Heights is not to the contrary.  858 F.3d 988, 993 (6th Cir. 2017).  Plaintiff in

---

[7] Plaintiffs argue that: "Supreme Court and Sixth Circuit precedent clearly establish that the Fourth Amendment is violated unless the 'governmental interests' in effectuating a particular kind of seizure (deadly force in this case) outweigh the 'nature and quality of the intrusion on the individual's Fourth Amendment interests.'"  (ECF No. 165-19 at 2268 (quoting Scott v. Harris, 550 U.S. 372, 383 (2007).)  The right asserted is too general to satisfy the clearly established requirement.  See Gavitt v. Born, 835 F.3d 623, 641 (6th Cir. 2016) ("To satisfy this requirement, the right allegedly violated must have been clearly established in a 'particularized' sense, such that a reasonable official confronted with the same situation would have known that his actions would be in violation of that right.") (quoting Brosseau v. Haugen, 543 U.S. 194, 200 (2004)).

Arrington-Bey sued officers who had arrested her mentally ill son for taking him to jail instead of a hospital. Id. at 991-92. The court found that, under the facts confronting the officers, there was no clearly established right for someone like plaintiff's son to be taken to a hospital. Id. at 993. The court noted that it could have ruled against plaintiff solely because she had failed to cite a case that clearly established the asserted right. Id. ("We begin with, and could end with, the reality that [plaintiff] points to no Supreme Court or Sixth Circuit case that requires the officers to take a delusional arrestee like [her son] to a hospital rather than a jail.") (emphasis added). However, the court came to its decision only after conducting an independent review of the law. Id. ("Arrington-Bey has not pointed to, and we have not found, any case like this one . . . .") (emphasis added). Any language suggesting that a court can rely only on the cases a plaintiff cites would be dicta.

To the extent Schilling argues for a broader application of Arrington-Bey, an application that would require Plaintiffs to cite a specific case under all circumstances, his argument is inconsistent with Elder v. Holloway. There, the Supreme Court rejected the principle that a court must decide whether a constitutional right was clearly established by relying solely

on cases plaintiffs cite. 510 U.S. 510, 516 (1994). In <u>Elder</u>,
the court reviewed a rule the Ninth Circuit had adopted in
qualified immunity cases: the appellate court must disregard
relevant legal authority not presented to, or considered by, the
district court. <u>Id.</u> at 512. Rejecting that rule, the <u>Elder</u>
Court held that, "review of qualified immunity dispositions is
to be conducted in light of all relevant precedents, not simply
those cited to, or discovered by, the district court." <u>Id.</u>
<u>Elder</u> instructs a circuit court deciding whether a
constitutional right was clearly established to "use its 'full
knowledge of its own [and other relevant] precedents.'" <u>Id.</u> at
516 (quoting <u>Davis v. Scherer</u>, 468 U.S. 183, 192 n.9 (1984))
(brackets in original). <u>Elder</u> rejected the notion that a
circuit court can rest solely on cases plaintiffs cite to it or
cases cited to or considered by the district court. That rule
applies in the first instance in the district court. Whether a
right was clearly established is a question of law. <u>Id.</u> Like
all questions of law, a district court's analysis is not limited
to the precise contours of a plaintiff's legal argument.
District courts, like circuit courts, have a duty to undertake
their own review of "all relevant precedents." <u>Id.</u> at 512.

 Plaintiffs do indeed have the burden of establishing that
Schilling is not entitled to qualified immunity. Meeting that

burden does not require Plaintiffs to cite a specific case
showing that Stewart's constitutional right was clearly
established.

## ii. Analysis

For a constitutional right to be clearly established,
precedent at the time of the alleged misconduct "must have
placed the . . . constitutional question beyond debate." Kielsa
v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting
White v. Pauly, 137 S. Ct. 548, 551 (2017)). That precedent
must be a case of "controlling authority or a robust consensus
of cases of persuasive authority." Plumhoff v. Rickard, 134 S.
Ct. 2012, 2023 (2014) (quoting Ashcroft v. al-Kidd, 563 U.S.
731, 741-42 (2011)). There need not be a case "directly on
point," Kielsa, 138 S. Ct. at 1152, but the contours of the
violated right "must [have been] sufficiently definite that any
reasonable officer in the defendant's shoes would have
understood that he was violating it," Plumhoff, 134 S. Ct. at
2023. "[I]f officers of reasonable competence could disagree on
[the] issue," the law was not clearly established. Malley
v. Briggs, 475 U.S. 335, 341 (1986).

Clearly established law may not be defined at a high level
of generality. See Kielsa, 138 S. Ct. at 1152. Garner and
Graham, which set forth general rules about when deadly force is

31

excessive, "do not by themselves create clearly established law outside an obvious case." Id. at 1153 (quoting White, 137 S. Ct. at 552) (internal quotation marks omitted). Precedent showing that the law was clearly established must be factually specific. See id. at 1152. That is especially true in excessive force cases, where "the result depends very much on the facts of each case . . . ." Id. at 1153 (quoting Mullenix v. Luna, 136 S. Ct. 305, 309 (2015) (per curiam). "[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Id. (internal quotation marks omitted).

Bouggess is factually similar to this case, although the facts are not identical. In Bouggess, a suspect physically struggled with an officer, broke free, ran about ten feet, and was shot three times in the back. 482 F.3d at 888, 890. The suspect did not bite the officer, twist his genitals, or do anything similarly combative. Id.

In Carden, 699 F. App'x at 498, a unanimous panel held that Bouggess clearly established that a constitutional violation occurred under facts substantially identical to, and in a number of ways more serious than, the facts in this case. An officer volunteered to assist a man stopped on the side of the road tending to a flat tire. Id. at 496. The man declined. Id.

The officer ran the license plate and saw that it did not match the vehicle registration. _Id._ When the officer approached again, the man punched twice at the officer and ran. _Id._ The officer tackled the man and a struggle ensued. _Id._ During the struggle, the two exchanged punches and the man repeatedly grabbed for the officer's gun. _Id._ The officer used his taser, but it did not subdue the man. _Id._ The officer eventually became entangled in the taser wires and suffered shocks. _Id._ at 497. The man then got on top of the officer. _Id._ The man did not reach for the officer's gun from that position. _Id._ The man let go of the officer, stood up, turned away from the officer, and started to flee. _Id._ The man "made it about one step" before the officer shot him in the back. _Id._ The man died of his wounds. _Id._ The court held that the officer's actions violated the man's clearly established Fourth Amendment right to be free from excessive force because "the law at the time of the encounter clearly established that deadly force would be excessive if used against an unarmed, fleeing felon who the officer lacked probable cause to believe posed a threat of serious physical harm." _Id._ at 498-99 (citing _Bouggess_, 482 F.3d at 892).

The court in _Carden_ held that the man did not pose a serious threat of harm to the officer when the officer shot him.

33

_A fortiori_, Stewart did not pose a serious threat of harm to Schilling when Schilling shot him. The man in Carden was significantly more violent than the Court must assume Stewart was. The difference of shot location –- back versus front and side –- is not material. Physical distance is the more relevant factor in determining whether someone is a greater or lesser threat. The physical distances in this case and Carden were virtually the same. Carden's reading of Bouggess and application of Bouggess to the Carden facts establish that Stewart's constitutional right to be free of excessive force was clearly established.

Viewing the facts in the light most favorable to Plaintiffs, Schilling violated Stewart's clearly established Fourth Amendment right to be free from excessive force. He is not entitled to qualified immunity. Schilling's Motion for Summary Judgment is DENIED.

## C.    Plaintiffs' Claim Against the City

Local governments can be sued under § 1983 for "their own illegal acts." D'Ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014) (quoting Connick v. Thompson, 563 U.S. 51, 60 (2011)). They are not vicariously liable for their employees' conduct. Id. They are liable only for official municipal policy that causes the deprivation of a federal right. Id.

34

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Plaintiffs must prove one of the following: (1) the existence of an illegal policy or legislative enactment; (2) that an official final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence in federal rights violations. See Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiffs then must show that the policy was the "moving force" behind the federal rights violation. Powers v. Hamilton Cty. Pub. Def. Comm'n, 501 F.3d 592, 607 (6th Cir. 2007) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)).

Viewing the disputes of material fact in the light most favorable to Plaintiffs, Schilling violated Stewart's Fourth Amendment right to be free from excessive force. Plaintiffs rely on the last three theories of municipal liability to establish that the City caused the violation.[8] The City argues that Plaintiffs have not offered evidence sufficient to support

---

[8] Plaintiffs have disclaimed the first theory of municipal liability. See (ECF No. 166-17 at 2410) ("Plaintiffs do not take a position on (1) the existence of an illegal official policy or legislative enactment.").

their claims and that the City is entitled to judgment as a matter of law.

### 1. Ratification

Plaintiffs base their ratification argument on the City's alleged failure to investigate Stewart's shooting adequately. (ECF No. 166-17 at 2410-11.) The Sixth Circuit has recognized municipal liability under § 1983 for a city's failure to meaningfully investigate allegations of unconstitutional conduct. See Leach v. Shelby Cty. Sheriff, 891 F.2d 1241, 1248 (6th Cir. 1989). One inadequate investigation is not sufficient. To establish liability, a plaintiff must show "a pattern of inadequate investigation of similar claims." Burgess, 735 F.3d at 478.

Plaintiffs rely on two pieces of evidence to show a failure to investigate adequately: (1) Jeffrey J. Noble's testimony that "there were no attempts by the City to resolve inconsistencies in the shooting"; and (2) Memphis Police Director Michael Rallings' testimony that the City never held a planned administrative hearing to address the shooting. (ECF No. 166-17 at 2411.) To demonstrate that this inadequate investigation was part of a pattern, Plaintiffs cite Noble's testimony that, although he could not "recall the details" and was "not even positive", he believed there was a case before July 17, 2015, in

36

which "a woman alleged that her [Memphis] police officer husband had shot . . . a gun off in her home . . . [a]nd there was no investigation at all." (ECF No. 166-5 at 2324-25.) That evidence is not sufficient to support Plaintiffs' failure-to-investigate theory.

Even if Noble's and Rallings' testimony were sufficient to show that the investigation of Stewart's shooting was inadequate, the inadequate investigation would not give rise to municipal liability. The investigation occurred after the Fourth Amendment violation. Something that occurred after a constitutional violation cannot have been its "moving force." See Swann v. City of Columbus, No. 2:04-cv-578, 2007 WL 1831131, at *3 (S.D. Ohio June 25, 2007) ("[S]ubsequent ratification of past wrongdoing cannot logically be the moving force behind the [wrongdoing].")

Noble's testimony is also insufficient to show a pattern of failing to investigate instances of excessive force against unarmed suspects. Assuming the vaguely remembered domestic incident described by Noble happened and was not investigated, it is not a claim similar to the one at issue in this case: an officer shooting a fleeing, non-dangerous suspect. Burgess, 735 F.3d at 478. Plaintiffs cite no other evidence on which a

reasonable jury could rely to rule in Plaintiffs' favor.  Their ratification claim fails.

### 2.    Policy of Inadequate Training

Inadequate training can serve as the basis for § 1983 municipal liability where it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). To succeed on this claim, Plaintiffs must show: "(1) that a training program is inadequate to the tasks that the officers must perform; (2) that the inadequacy is the result of the [City's] deliberate indifference; and (3) that the inadequacy is closely related to or actually caused [Stewart's] injury." Brown v. Chapman, 814 F.3d 447, 463 (6th Cir. 2016) (quoting Plinton v. Cty. of Summit, 540 F.3d 459, 464 (6th Cir. 2008)).

Plaintiffs argue that the City inadequately trained Schilling in two ways: (1) the City trained him to check all individuals for warrants during a traffic stop; and (2) Schilling was not trained to call for backup before arresting uncuffed suspects seated in the back of patrol cars.  (ECF No. 166-17 at 2412.)

The first argument fails on the first prong.  Training officers to request all passenger information and checking for warrants is not inadequate to the tasks officers must perform.

It is a custom to ensure officer safety. It is not, as Plaintiffs claim, unconstitutional. See United States v. Alexander, 467 F. App'x 355, 362 (6th Cir. 2012) ("[A]n officer does not violate the Fourth Amendment during a traffic stop by asking for passenger identification, even where there was no reasonable suspicion of any wrongdoing.")

The second argument also fails on the first prong. Plaintiffs present evidence that Schilling did not remember being trained to call for backup before arresting uncuffed suspects seated in the back of patrol cars. (ECF No. 149 at 871-72.) Plaintiffs argue that, "[i]f [Schilling] would have known the policy at the time . . . he would have called backup." (ECF No. 166-17 at 2412.) Even if Schilling's failure to recall supported an inference that the City improperly trained him, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city . . . ." City of Canton, 489 U.S. at 390; see also Winkler v. Madison Cty., 893 F.3d 877, 904 (6th Cir. 2018); Carey v. Helton, 70 F. App'x 291, 294 (6th Cir. 2003). Evidence that the City inadequately trained Schilling, without more, is not enough to prove that the City had an inadequate training program. Id.

Plaintiffs cite no other relevant evidence.[9]  Their failure-to-train claim fails.

### 3.    Custom of Tolerance or Acquiescence

To prove a custom of tolerance or acquiescence, Plaintiffs must show: "(1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the moving force or direct causal link in the constitutional deprivation." Stanfield v. City of Lima, 727 F. App'x 841, 851 (6th Cir. 2018) (quoting Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (internal quotation marks omitted).

Plaintiffs cite two pieces of evidence to show that the City had a custom of tolerating excessive force by its officers. The first is the City's administrative investigation, which determined that Schilling's use of force against Stewart was justified.  (ECF No. 166-17 at 2413.)  The second is testimony by Noble that, when taken together, this case and a prior case in which the City allegedly failed to investigate a claim that

---

[9] Plaintiffs cite one piece of evidence that does not support their argument. Ken Katsaris testified that the City's backup calling policy is "inconsistent with officer safety and survival."  (ECF No. 166-7 at 2331-32.)  That does not support Plaintiffs' principal point: following the policy would have prevented Stewart's death.

40

one of its officer fired his gun during a domestic dispute, "send a message to [Memphis police] officers that they can engage in constitutional violations with impunity . . . ." (ECF No. 166-5 at 2326.)

That evidence is not sufficient to satisfy the first prong. It does not show a clear and persistent pattern of excessive force during arrests. First, one administrative determination on one officer-involved shooting does not show that officers regularly use excessive force. A pattern requires more than one incident. Second, an officer firing his gun during a domestic dispute differs materially from the constitutional violation at issue in this case -- excessive force during an arrest. The domestic violence incident does not support a pattern of Memphis police officers shooting unarmed, non-dangerous suspects. Plaintiffs cite no other evidence on which a reasonable jury could rely to determine there was a custom of tolerance or acquiescence. Plaintiffs' claim fails.

### 4. Plaintiffs' Fourteenth Amendment Claim

Plaintiffs argue that "[t]he City failed to protect Stewart from violence after Stewart was taken into custody." (ECF No. 166-17 at 2413.) Plaintiffs rely on DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189 (1989), and its progeny. DeShaney acknowledged that, "when the State takes a person into

custody and holds him there against his will," the Fourteenth Amendment's Due Process Clause "imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200. The Court, however, has previously dismissed Plaintiffs' Fourteenth Amendment claim. (ECF No. 37 at 299 ("[T]he Court finds that Plaintiffs have failed to plead a § 1983 claim for the violation of Stewart's Fourteenth Amendment rights.").)

Even absent that dismissal, Plaintiffs' argument would not succeed. It relies on an offshoot of DeShaney: the state-created danger doctrine. (ECF No. 166-17 at 2415 ("Applying the state-created-danger theory to the facts of this case . . . .).) To establish liability under that doctrine, a plaintiff must show "affirmative acts by the state that 'create or increase the risk that an individual will be exposed to private acts of violence . . . .'" Estate of Barnwell v. Grigsby, 681 F. App'x 435, 443 (6th Cir. 2017) (quoting Peete v. Metro. Gov't of Nashville and Davidson Cty., 486 F.3d 217, 223 (6th Cir. 2007)) (emphasis in original). Plaintiffs claim that Stewart was harmed by a state actor, Schilling, not by a private actor. Plaintiffs' state-created danger argument must therefore fail. See id.; Epperson v. City of Humboldt, 140 F. Supp. 3d 676, 689 (W.D. Tenn. 2015) (finding doctrine inapplicable where the

42

decedent "was detained, arrested and physically injured by the Defendant officers", but plaintiffs "made no allegation that the officers placed him at risk of a violent act by a third party").

### 5. Conclusion

Plaintiffs have not cited evidence sufficient to permit a reasonable jury to find that the City's policies and customs caused Stewart's constitutional injury. The City's Motion for Summary Judgment is GRANTED.

## IV. Schilling's Motion to Exclude Testimony of Jeffrey J. Noble

### A. Standard of Review

Federal Rule of Evidence 702 allows expert testimony where the witness is shown to be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The trial judge serves as "gatekeeper" to determine whether a proposed expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993). Even if the witness is qualified, the subject matter of his testimony must match his qualifications. Coal Res., Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263, 1268 (6th Cir. 1992).

### B. Motion to Exclude

Schilling moves to exclude three aspects of expert Jeffrey J. Noble's testimony: (1) his opinion that Schilling's use of

deadly force was unreasonable and excessive; (2) his opinion that Schilling created the danger that led to the shooting; and (3) his opinion that Stewart did not strike Schilling because, had Stewart done so, Schilling's injuries would have been more severe. (ECF No. 153-1 at 1657.) For the following reasons, Schilling's Motion is GRANTED.

### 1. Opinion that Schilling's Use of Force Was Unreasonable and Excessive

Schilling argues that the conclusion in Noble's expert report that "the use of deadly force by Officer Schilling was objectively unreasonable" and "excessive" is an inappropriate legal conclusion. Experts may testify in excessive force cases "so long as [they] refrain[] from expressing legal conclusions." King v. Taylor, 944 F. Supp. 2d 548, 555 (E.D. Ky. 2013) (citations omitted). An expert's opinion that an officer's use of deadly force was unreasonable is an inadmissible legal conclusion. See DeMerrell v. City of Cheboygan, 206 F. App'x 418, 426 (6th Cir. 2006); Norman v. City of Lorain, No. 1:04CV913, 2006 WL 5249725, at *3 (N.D. Ohio Nov. 27, 2006) (holding that expert "may testify concerning the proper procedures to be followed in the situation faced by [the officer], but he may not testify that the force used by [the officer] was 'unreasonable' or 'unnecessary'"). The same is true of an expert's opinion that an officer's use of force was

"excessive." See Thompson v. City of Chicago, 472 F.3d 444, 458
(7th Cir. 2006); United States v. Eberle, Cr. No. 08-20139, 2008
WL 4858438, at *2 (E.D. Mich. Nov. 10, 2008).  Noble's opinion
that Schilling's use of force was "objectively unreasonable" and
"excessive" is inadmissible.  Schilling's motion on this issue
is GRANTED.

### 2.    Opinion that Schilling Created the Danger that Led to the Shooting

Schilling argues that, in light of the Sixth Circuit's
segmenting rule, the following opinion from Noble's expert
report is irrelevant and would confuse the jury: "Had Officer
Schilling followed his department policies, adhered to his
training and followed generally accepted police practices, it is
likely that any use of force would not have been necessary and
that Mr. Stewart would not have been killed."

The Sixth Circuit has held that excessive force claims
should be examined in segments.  See Chappell, 585 F.3d at 914;
Lubelan, 476 F.3d at 406-07.  The court must first identify the
seizure at issue in the particular case and then examine
"'whether the force used to effect that seizure was reasonable
in the totality of the circumstances, not whether it was
reasonable for the police to create the circumstances.'"
Lubelan, 476 F.3d at 406 (quoting Dickerson, 101 F.3d at 1161).
The court must not consider decisions made by officers preceding

45

the seizure, but instead must "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force." Id. at 407. Noble may not rely on events that occurred before Schilling's use of force when expressing opinions at trial.[10] See Claybrook v. Birchwell, 274 F.3d 1098, 1105 (6th Cir. 2001) ("Although the officers' decision to approach Claybrook in the manner that they did was in clear contravention of Metro Nashville Police Department policy regarding procedures for undercover officers, under Dickerson, any unreasonableness of their actions at that point may not weigh in consideration of the use of excessive force."). Schilling's motion on this issue is GRANTED.

### 3. Opinion that Stewart Did Not Strike Schilling

Schilling argues that Noble's opinion that "Schilling's injuries were not severe enough to support his account of the altercation with Mr. Stewart" should not be permitted at trial. (ECF No. 153-1 at 1662.) Noble bases his opinion on the lack of

_____

[10] Plaintiffs cite Bletz v. Gribble, 641 F.3d 743 (6th Cir. 2011), for the proposition that Noble should be allowed to consider the events leading up to the shooting when expressing his opinions at trial. Their reliance is misplaced. By way of dicta, the Sixth Circuit said in Bletz that, "[w]here the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used." Id. at 752. The court went on to say that, "[i]n the case before us, we need not decide precisely which preceding events (i.e., the breadth of the excessive-force segment) should properly be considered in analyzing the reasonableness of Gribble's use of deadly force." Id. The Sixth Circuit has held that the "segmented approach applies even to encounters lasting very short periods of time." Greathouse v. Couch, 433 F. App'x 370, 372 (6th Cir. 2011) (citing Claybrook v. Birchwell, 274 F.3d 1098, 1105 (6th Cir. 2001) (segmenting a 1-2 minute encounter to analyze an excessive force claim)).

discernible damage to Schilling's face in photographs taken shortly after the shooting. Noble describes the officer's injuries as "nothing more than some redness in his face and a slight abrasion over his nose." (Id. at 1663.) Noble opines that Schilling was not in fact struck as he claims because "[o]ne would expect much more serious injuries if one were struck repeatedly in the face with a pair of handcuffs." (Id.)

Noble's testimony would not assist the jury. If an expert's testimony addresses matters within the average juror's common knowledge, it is unnecessary because it "will not assist the trier of fact to understand the evidence or determine a fact in issue." Berry v. City of Detroit, 25 F.3d 1342, 1350 (6th Cir. 1994); see also Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993) ("Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror."). Whether photographs support Schilling's claim that he was struck in the face with handcuffs is within a juror's common knowledge. Noble did not use any particular methodology to determine how much damage someone struck by handcuffs would show. He compared photographs to testimony, and concluded, based on his lay knowledge, that the photographs told a different story. The jury could do the same. Schilling's motion on this issue is GRANTED.

## V.    Conclusion

For the foregoing reasons, Schilling's Motion for Summary Judgment is DENIED, the City's Motion for Summary Judgment is GRANTED, and Schilling's Motion to Exclude Testimony of Jeffrey J. Noble is GRANTED.


So ordered this 25th day of January, 2019.


                              /s/Samuel H. Mays, Jr._____
                              SAMUEL H. MAYS, JR.
                              UNITED STATES DISTRICT JUDGE